### ARNOT v. UNION SALT CO.

(Supreme Court, Appellate Division, Third Department. June 24, 1909.)

MORTGAGES (§ 463*)—FORECLOSURE—EVIDENCE.
　　In a suit to foreclose a mortgage securing corporate bonds, evidence *held* not to show that plaintiff had agreed with the directors to waive payment of certain interest coupons when due.
　　[Ed. Note.—For other cases, see Mortgages, Cent. Dig. §§ 1365, 1366; Dec. Dig. § 463.*]
　　Cochrane, J., dissenting.

Appeal from Trial Term, Schuyler County.
Action by Matthias E. Arnot as trustee, against the Union Salt Company. Judgment of dismissal upon the merits, and plaintiff appeals. Reversed, and new trial granted.

---

*For other cases see same topic & § NUMBER in Dec. & Am. Digs. 1907 to date, & Rep'r Indexes
　　117 N.Y.S.—70

Argued before SMITH, P. J., and CHESTER, KELLOGG, COCHRANE, and SEWELL, JJ.

Reynolds, Stanchfield & Collin (Frederick Collin, of counsel), for appellant.

Philo B. Safford, for respondent.

JOHN M. KELLOGG, J. Upon a former trial a judgment was entered in favor of the plaintiff, which was reversed by the Court of Appeals in 186 N. Y. 501, 79 N. E. 719, upon the ground that the undisputed evidence upon the record as it then appeared showed that the plaintiff had waived the payment of the coupons which became due July 1, 1904, and thereby was unable to declare the whole amount of the mortgage due for their nonpayment. The general facts of the case appear in that report, and it is unnecessary to repeat them here. In the main, therefore, reference will now only be made to the additional facts which were not in that record.

Several facts compelled the conclusion upon that record that the plaintiff had waived payment of the coupons maturing July 1st and acquiesced in the agreement not to present the coupons for payment: (1) The failure of the plaintiff to deny the circumstances in which it is alleged he participated tending to show a waiver. (2) The evidence that at a subsequent meeting of the board of directors Arnot stated that some coupons had been presented for payment, and stated that he understood "we were to wait for our interest." (3) Apparently the most convincing ground was that after plaintiff had received credit at the trust company for the coupons, and with the apparent knowledge that there was money in the trust company sufficient to pay a part of them, he gave his check to the trust company for the full amount which he had been credited with on account of the coupons. (4) That January 4, 1905, he wrote the company:

"I am holding coupons cut from the Union Salt Company's bonds which fell due January 1, 1905, also July 1, 1904, and they are at the present time unpaid. I should like to know what provision is being made to pay them."

It was thought that this letter, under the circumstances appearing in the record, also tended to show that plaintiff had consented to withhold his coupons. Upon the trial the plaintiff was sworn as a witness, and gave his version of the various matters appearing in the former record, and other evidence appears which irresistibly shows that the plaintiff did not consent to waive the payment of the July interest and that no one understood that he had given such consent. The former record assumed that Buchanan was a representative in some way of the plaintiff. The present record shows that he was not such representative. They were simply acquaintances; Buchanan being a customer at the trust company at which the plaintiff was the president and leading spirit. At the meeting of the directors, in the absence of plaintiff, when it was agreed by those present to waive the presentment of their July coupons, they requested that Buchanan communicate the fact to the plaintiff and see if he could obtain his consent. Buchanan was clearly the agent of the parties attending the meeting, and was not representing the plaintiff in any matters growing out of it. It appears that Buchanan and Hawes, the secretary and treasurer,

'arranged between themselves to see the plaintiff June 30th, but on account of his absence from his office were unable to meet him. It was then agreed between them that Buchanan was to see the plaintiff and communicate the result over the telephone to Hawes. Buchanan and the plaintiff both swear that the plaintiff refused to consent to join in the agreement as requested, saying they had made so many promises to him, and never fulfilled any of them, that he would refuse to withhold his bonds or his coupons. ·Buchanan testifies that he upon the same day telephoned to Hawes that Arnot refused to withhold his coupons. He further says:

"I suggested to him that the best thing to do was to get the money in as soon as possible and pay the coupons, and he agreed with me, and said he would do the best he could in regard to the matter."

Hawes at first denies any communication from Buchanan to him over the telephone, but finally admits upon his cross-examination that Buchanan did telephone him, and says:

"He called me, and we had some conversation in regard to these coupons; but there was nothing in the conversation that would intimate any refusal to abide by the— I do not remember what the conversation was. I could not say a word that was said."

The fact that the coupons were discussed over the telephone, and the inability of Hawes to state a word of the conversation, and his lack of memory, deprives his conclusion as to what he thought the conversation intimated of all real value; and the evidence indicates clearly that on July 1st the plaintiff refused his consent and that the fact of such refusal was communicated to Hawes. At the September meeting Wright swears that Arnot said he noticed that some coupons had been paid July 1st, and asked why it was, and said "that he thought we were all to wait for our interest, or words to that effect." Buchanan swears that Arnot said that the coupons on some of the bonds ought not to have been paid unless all were paid, and denied that he said anything to the effect that he understood they were to wait for their interest or coupons. Arnot says he was surprised to find that certain coupons had been paid, "and I said to Mr. Wright that I was surprised, and I supposed the bondholders were all to be paid alike." He denies the statement attributed to him by Wright.

A letter was introduced upon this trial from President Wright to Hawes, dated December 12, 1904, saying, among other things:

"In view of the very short working capital which we have, and the precarious position in which this places us; also in view of the fact that our bond interest due July 1st last will be six months in arrears January 1st, and another interest payment becomes due at that time—it seems not only expedient, but necessary, that we use up at once the coal we have on hand in making salt, dispose of all our salt to the best advantage, * * * collect as fast as possible the outstanding accounts, and use the money so obtained to meet our interest payments, and make some payment on account of the note due for $8,000 about January 1st. If we do not do this, the company will be in danger of foreclosure proceedings after January 1st."

: This letter indicates pretty plainly that the president then felt that the payment of the July 1st interest had not been waived, and that foreclosure under the acceleration clause was imminent after January 1st, unless the back interest was paid. This letter, together with the

testimony of all the other persons at the September meeting, leads to the conclusion that the president, at least, understood the remarks of the plaintiff in a different manner than all the others understood it, and in a manner not justified by what was said. When the notice was served by the plaintiff, electing to treat the whole mortgage due, and demanding possession of the property under the terms of the mortgage, on the assumption that there had been a six months' default, Hawes, the secretary and treasurer, said that:

"Paragraph 5 of the mortgage gave Mr. Arnot the right to take possession, as the July coupons had been due more than six months, and perhaps Mr. Arnot was justified in taking possession, and that he wished Mr. Arnot would wait for the meeting that would be held January 1st."

Hawes, although recalled after this testimony, did not controvert it. It now appears that, while the plaintiff was largely interested in the trust company and the president thereof, his poor health and advanced age withdrew him from the active management of the business, and he gave no attention to the books or details, but acted principally in an advisory capacity, the real service performed by him being as chairman of the executive committee to pass upon loans and paper offered the company, and that he had no personal knowledge of the state of the account between the trust company and the defendant. After July 1st the active manager of the trust company notified him that the coupons were unpaid, had been credited to him, and asked his check for the purpose of squaring his account, which he gave. The trust company having credited him with the amount of the coupons, it was necessary for him when the money was not realized upon them, to give his check to correct the credit erroneously given him. The manager swears he had no communication with the plaintiff, but treated this matter in the ordinary way of business; that if a depositor left coupons of a company with a deposit slip, and there was not a sufficient amount to pay all of the coupons of the same tenor, that no credit would be given; and that the amount standing to the credit of the debtor upon the coupons would not be applied so far as it would go to discharge them.

Upon a former record it was properly assumed that the plaintiff had knowledge of the state of the defendant's account at the bank, and that by not applying the amount it had on hand towards the discharge of the coupons and his giving his check for the whole amount it might fairly be construed as an act waiving the presentment which had already taken place. The plaintiff having no knowledge as to the state of the account, but simply giving his check for the amount requested, upon a statement that the coupons were unpaid, cannot upon this record be considered as evidence against the plaintiff. He was treated by the bank like any other customer under similar circumstances. Taken with the other circumstances disclosed by this record, the letter of January 4, 1905, is not inconsistent with plaintiff's position. He writes to the president of the company that he is holding the coupons cut from the bonds January 1, 1905, and July 1, 1904, unpaid, and inquires what provision is made for them. He then says he is informed that Mr. Wright has sold his stock, and continues:

"Do you know whether this is a fact? Have you also parted with your stock, or with any part of your holdings? An early reply will greatly oblige."

The letter is a quiet, easy way for a business man to approach his friends, whom he believes have sold out the company from under him, and thereby deprived his security of a substantial part of its value. He evidently knew the facts as to which he inquired. The words "I am holding the coupons" can only be construed to mean "I am the holder of coupons." Hawes answers this letter that he is informed by the president that a substantial payment will be made on the note and the interest paid; but the writer does not know when or how it will be done, and only surmises that the new interests which have acquired the control of the company may have something to do with it. He then admits that Wright has sold some of his stock and that he has done the same thing, and that from later circumstances he cannot tell whether the purchaser is a bona fide purchaser, or a dummy for the International Salt Company, a rival of the defendant, and then the writer adds:

"As it now stands, yourself, Mr. Coon, and myself, hold the minority stock, except 50 shares scattered around in small lots."

The plaintiff, apparently believing that the officers of the company in whom he had placed some confidence had betrayed him and delivered the company to a rival in business, immediately, for the interest of himself and other bondholders, takes the necessary and proper steps to realize what may be from the property itself. The testimony of the plaintiff is apparently candid and full, and his conduct fair and impartial with reference to the various interests he represented. The evidence against him as to what he said and did is not satisfactory, is evasive, and is not consistent with the records and the facts clearly shown in the case. The record shows that the coupons owned by the plaintiff were presented to the bank for payment on the due day, and payment was not made on account of the absence of funds, and that after the elapse of the six months' period mentioned in the mortgage, the plaintiff took the necessary steps to accelerate the due day, and thereupon the whole mortgage debt became due. The plaintiff did not waive the payment of the July coupons, but stood upon his rights. Arnot told Buchanan, at the time Buchanan, in behalf of the other directors, asked him to waive the July interest:

"That they had made so many promises to him, and never fulfilled any of them, that he would refuse to withhold his bonds or his coupons."

Buchanan was at the time representing the other directors, who with him had agreed upon an extension. Arnot declined the extension, and evidently with certain distrust of the other directors, and subsequent developments do not show this distrust was unreasonable. The evidence shows that Buchanan communicated the refusal to the treasurer of the company, which the treasurer mildly denies. The fact is beyond dispute that Arnot refused to become a party to the arrangement, and the subsequent evidence shows no fact inconsistent with his refusal, or tending to show that in any manner he had changed his position, and this record does not show that any director had acted or was induced to act on account of any supposed consent of the

plaintiff. It is true the plaintiff took no action on account of the default in his coupons until he wrote the letter of January 4th, but there was no act he could consistently take. The whole amount could not be declared due until after January 1st. It is evident that the trial court did not give due consideration to the new evidence.

The judgment should therefore be reversed upon the law and the facts, and a new trial granted, with costs to the appellant to abide the event. All concur, except COCHRANE, J., who dissents.

---

### McCORMICK v. ROCHESTER RY. CO.

(Supreme Court, Appellate Division, Fourth Department. July 6, 1909.)

1. CARRIERS (§ 318*)—INJURIES TO PASSENGER—EVIDENCE.

Evidence *held* sufficient to warrant a finding that the injury to plaintiff's intestate, a passenger on a street car, was the proximate cause of his death.

[Ed. Note.—For other cases, see Carriers, Cent. Dig. § 1307; Dec. Dig. § 318.*]

2. DEATH (§ 99*)—ACTIONS—DAMAGES—AMOUNT.

A verdict for $12,958 for the death of a man 35 years old, apparently in perfect health, conducting a profitable business, and leaving a wife and daughter, is not excessive.

[Ed. Note.—For other cases, see Death, Cent. Dig. §§ 125–130; Dec. Dig. § 99.*]

3. TRIAL (§ 315*)—CONDUCT OF JURY—MANNER OF ARRIVING AT VERDICT.

[Ed. Note.—For other cases, see Trial, Cent. Dig. § 740; Dec. Dig. § 315.*]

Williams, J., dissenting.

Appeal from Trial Term, Monroe County.